The first matter is In Re Diet Drugs. Mr. Petroff? Good morning. I'm Mr. Petroff. I'm representing the appellants in this case, along with my co-counsel, Stan Hudson and Wayne Spivey. There are two preliminary matters that I need to bring up. I realize this takes out of my time, but I need to bring them up. We filed a motion for leave to supplement the appendix yesterday. It was agreed to. It involved two pieces of paper that were left out by a clerical error. I don't know if we need to address that. No. We've seen that. Okay. And then the other thing I would ask for four minutes of rebuttal time. Very good. I thought I would start the argument by starting with where Judge Bartle was when he ruled on this, Your Honor. He was looking at a situation. He agreed that the issue, and he stated this and I think everybody agrees, the issue at the trial court was whether there was a reasonable medical basis for the opinion, just one opinion, of the attesting physician, Dr. Reed Harris. That was the issue. Was there a reasonable medical basis in the record in front of Judge Bartle? I would submit it's not a very high standard at the trial court level, but I would submit here it's a very high standard. Because here, the issue is whether he abused his discretion or committed clear error in denying the claim of my client, Mrs. Patterson. So I think that's the legal framework. Judge Bartle, at page six of his order, said that that was what he thought the issue was. And what's interesting is he also recognized that there were only two possible orders. He said that at page six. He could either affirm the post-audit determination of the trust, which denied our claim, or he could overrule it and order that the claim be paid. There wasn't, I mean, that's what he said, and I think that's the way the settlement agreement is set up. There were only two orders that he could have issued. Now of course he could have gone on and ordered other appropriate relief, but at page six he says, those are my two orders, and I must, that's his word, I must do one or the other. And does, did he have any other options under the settlement agreement? Oh, there's no question he could have ordered a discovery, he could have, yes, he could have done, frankly, anything. Yeah, but this thing is so structured. You're going to have the district judge supervising a huge MDL like this, getting into discovery matters when there's so many different ways, there's so many procedures in order before it gets up to him. I mean, you could have asked for a technical advisor, you did not. I mean, there were a lot of things that you could have done up to this particular point. No question about that. And I stand by what I did, and I have no regret about it, and we can discuss that. Because in light of the fact he only had two orders that he could issue, we had it won. We had it won, without any doubt. And I'll explain that in a minute, because that's what this whole case is about. Well, why don't you go ahead and explain it. Okay. What we start with is Dr. Reed Harris, he filed a green form, he stated under oath that this client had the requisite injury. He stated that under oath, there's no issue about that. The case went to audit in front of Judge, I mean, Judge, in front of Dr. Churchwell. Dr. Churchwell is the trust's auditor, and I think it's extremely important to look at what was in front of Judge Bartle on all three doctors, and there's only three doctors involved in this. But what Judge, what Dr. Churchwell did, and this is at my appendix, PA 350, he ruled, on trivial to mild regurgitation and an overestimation, it was his opinion. And it's extremely important to focus on what was in front of the court, because unfortunately Judge Bartle ruled on a lot of things that weren't in front of him. He ruled that we shouldn't be able to rely on a single isolated jet, but there's nowhere, anywhere that we tried to say you could. And so it's important to focus on what he had in front of him when he ruled. I have a chart that has been agreed to, and I understand, and, you know, a picture speaks a thousand words. I'm hoping I can get through this with a chart to show you. Because the whole issue is, was there a reasonable medical basis? Can I? Sure. Pardon me for interrupting, but Richard Cattrall said that the chart would be, we considered an easy chart, not a free chart. Oh, all right. Fine. Of course. Thank you. Sorry, this is a structural issue. Of course. And I'm sorry. So the chart shows what was in front of the judge. And what's critical about this is, all the experts agreed on everything except one question. And that's important, because it's not like we have some outlandish echo, or it's not like their cardiologist, the auditing cardiologist said it's a bad echo. Don't get too far from the microphone. I'm sorry. We have you on tape here. But what this shows, Your Honor, is there is only one thing that all three of these doctors disagreed on, and that was the extent of the mitral regurgitation. That's the only issue. The doctors agreed she wasn't entitled to any money on any other basis. Our experts agreed on that. We understand that. Okay. So what we have then, Your Honor, is we get Churchwell's report, which I think doesn't say much. It doesn't say much. It says, MR overestimated, and critically, he says less than 20%. It's clear that for this lady to qualify, she needs to have between 20% and 40% leadership. We understand that. Churchwell didn't say 6%. Churchwell didn't say 0 to 6%. He said less than 20%. That's all we have from him, less than 20%. And that's sufficient, is it not? Less than 20% is sufficient. Now, you have to be 20% or more. Right. But I mean, to eyeball a less than 20% within a certain range is sufficient. Absolutely. Right. So what he did, he all eyeballed and said less than 20%. So Judge Bartle, at that point, would be looking at one doctor who said 20% and one who said less than 20%. And Churchwell even said mild in his auditing cardiologist worksheet. He said mild. That's important because... Not trivial. He never said trivial. He said trivial to mild in one place. But in another, he very clearly said mild. And when he says less than 20%, that's the range for mild. The range for trivial would be 0 to 5%. But you've got to get to moderate. Yes, sir. No question I have to get to moderate. And here's how we did it. And here's why I was so confident then. And here's why I'm so confident now. Dr. Silvestri's report, he teaches echocardiography over here at Penn. Respected cardiologist, and this is critical because this is what we contend clearly won the case for us. In his report, he says on multiple occasions, he reviewed the echo. He made measurements. And in the very middle of his report, and this is really critical, he said that the jet I traced is an aliased Doppler jet emanating from the mitral valve. Judge Bartle has held that is the hallmark of high-velocity regurgitation. The hallmark. That's in PTO 2640 at page 11. The hallmark. So we have a level three doctor from Penn saying the hallmark is... How do we know that he reviewed the entire study? How do we know that he reviewed all the clips? The exact same way that we presume the auditing cardiologist did. They both said, they both have the same form, basically. They said, we complied with the audit policies and procedures. He said, I reviewed the echocardiogram. He said, I made measurements. Not measurement. He made measurements, and he reached the maximum regurgitant jet. You can't know if it's a maximum. Is it representative? Great question. Representative came up very recently. Representative, that word did not exist in 2640. It did not. Representative is going to be something you will see in this court, unfortunately, because representative of what? Now we tell our experts it's got to be representative. Right. Because if you have a big jet, it can be an anomaly. It can be a one-time occurrence when, for the most part, there is not the equivalent of moderate. And so when he talks about one jet, how do we know that he, in fact, is talking about the overall condition? Because he says here in the middle, I independently interpreted the study and performed my own measurements of the left atrial and regurgitant jet area. We have no more than that. We don't have anywhere near that much from the auditing cardiologist. How do we know the auditing cardiologist looked at the whole study? You know because it's reasonable. And here's important. The auditing cardiologist has multiple places where he could have criticized this study, and he could have said the tracing is improper or the measurements are improper. He could have said the tape was forged. Was Dr. Silvestri's report ever reviewed by Dr. Churchwell? That I wouldn't know because it's the trust. I know if Silvestri was written after Churchwell. That I know. Because Churchwell is the one who reviews, and if he, Dr. Silvestri isn't reviewing Dr. Harris. Churchwell reviewed Dr. Harris, and to overturn Dr. Churchwell doesn't he have to, or to change his mind or to revise his opinion, doesn't he have to look at Dr. Silvestri as he looked at Dr. Harris if you are going to say the trust reviewer opinion will not stand? That's not the way the procedures are set up. It simply isn't. They could have Churchwell look at Silvestri, but Silvestri by definition comes after Churchwell. Yeah, but at a different level. Just like you can have two district courts reviewed by us, but if we review one district court and another district court comes up with a different opinion, that doesn't overrule what we say. No. What it amounts to is the judge has to look at the three doctors and say is there a reasonable medical basis. If so, I must rule in favor of the claimant, and if not, I must rule against the claimant. But in no way has Dr. Churchwell's opinion been overturned. I totally agree or disagree. I totally disagree. And that's a very significant point about Silvestri's report. He specifically says, and this is down here in the last paragraph, he goes way beyond what he had to. He said, the arditing cardiologist does not contest the presence of mitral regurgitation. He goes on to say the arditing cardiologist may be expressing his or her qualitative opinion of the degree of MR. So that's very important because he does it independently, blindly. He says, I agree that it is a matrix case. Then he says, I looked at Dr. Harris's report. I agreed. Then he says, I looked at Dr. Churchwell, and I think he's doing this. And then he says, I've got the hallmark right here. I made a glossy photo for you of the hallmark of high-velocity regurgitation that cannot be an artifact. It is the real thing, Your Honor, and that's what he said. And I've been told I have three minutes. Hold on just a second. When is the first time that this concept of a representative measure of regurgitant flow is raised? The first time that I saw it was in this opinion, in this case. It definitely is not in 2640, and that's the answer to your question. But isn't it, I mean, don't you get that from reading 2640? I think so. Absolutely. I absolutely think. No, no, no. I mean, don't you, this idea of a representative measure, isn't that implicit? I think it's absolutely implicit throughout, and it's important that you understand that I agree with that, that it is implicit, that you can't take an isolated jet, you can't take something that's over on the wall of the heart, some eccentric jet, they call it, and say that's regurgitation. It is implicit that you have to look at the study, you have to confirm it, you have to agree that it's there. It's implicit. Well, is the problem that Dr. Silvestri was not explicit, that this was what he did in this case? I don't think so at all. I think Dr. Silvestri, if you take the three opinions that Judge Bartle had to work with, Silvestri covers much more, he says much more, he addresses all the issues. He addresses the attesting doctor, he addresses church will, he does a photograph of it, he says he independently did his measurements. Okay. Why didn't you ask for a technical advisor on this? Because, Your Honor, the case is won at that point. I was afraid of delay. I mean, here we are five years later, but at the time I was afraid of delay, there admittedly was a concern about rushing to get there before a big log jam of cases, and I still think we did the right thing because a technical advisor, well, we didn't need one. Okay. We understand your answer. Mr. Petroff, isn't this just a battle of experts, and why is it an abuse of discretion for the district court to choose Dr. Churchwell over your two experts? I think that it could be a battle of experts if the court assumed that all the experts were saying the exact same thing. I think we would have a battle. It would be, how do we know? But they weren't saying the same thing at all. Dr. Silvestri did far more. He explicitly went out of his way to do a blinded study first and then come back and see Harris and then come back and see Churchwell. He said this is an aliasing jet. Churchwell never said any of that. Churchwell said less than 20. That's what we got from Churchwell. But didn't the court have the right to accept or reject any of the doctor's findings in coming to his conclusion? No question. My question is simple. How is this an abuse of discretion? Because, Your Honor, what we're faced with is a situation where all you need is a reasonable medical basis. You don't even need to be right. You need to have a reasonable medical basis. And if you do, you must. That's what he said at page 6. I must rule in favor of the claimant. And there was a reasonable medical basis. What he did, and the opinion is fraught with this, he simply took overestimated and turned it into improper tracing, improper measurement. He even started talking about conduct leading to an improper echocardiogram. None of that is in this record. He took overestimation, which is by definition, it could simply be a difference of opinion. I overestimated how long it took me to do something. I overestimated how long it would take my argument here. And that's something that is just a difference of opinion. That doesn't mean it was unreasonable. Good. Thank you. We'll have you back on rebuttal. Thank you. Mr. Rosenbaum. Good morning. Good morning, Your Honor. Robert Rosenbaum for Appellee Wyeth. Let me first state that I agree with Mr. Petroff's statement of what the issue was, with one exception, a very important exception. And that is, the issue is whether Ms. Patterson met her burden of establishing that there was a reasonable medical basis here. And that is an important issue here because, as Your Honor noted, Ms. Patterson could have submitted additional information. She could have requested reconsideration of Judge Bartle's decision here. But she didn't do any of that. She submitted Dr. Harris's opinion, which was right on the borderline at 20%, based on a very precise measurement that he stated in his certification. And under the audit rules, the auditor, who's an independent cardiologist chosen by independent trustees, looks at the echocardiogram tape and, in this case, concluded that not mild but trivial to mild was the range here. Now, mild is 5% to 20%. Trivial to mild would be a range that includes less than 5%. Judge Bartle has stated there's nothing wrong with a person that has that kind of regurgitation. Now, I'd also like to point out the fact that we're not dealing here with competing experts. The auditor is an auditor. It's not an advocate. The Argentine cardiologist comes forward with an opinion, and that opinion carries special weight because that is an independent person who's chosen by independent trustees, not an advocate in the case. Could Mr. Petroff have requested that Dr. Churchwell review the Silvestri report? He could have done so. There's no restriction on such a request. Would the trust have gone along with that? Well, I don't represent the trust, so I can't say. Wyeth would not have objected to that. But I can tell you that what was offered, the only other evidence, because at that stage, Mr. Petroff says they had won the case. Not true, because the auditor's decision outweighs the certifying physician's. He submitted Dr. Silvestri's opinion. Now, you asked when was the first time the representativeness was raised, and he said it was implicit in 2640, which was issued in November of 2002, but also in April of 2003, before Dr. Silvestri's report, a new training course was adopted for auditing cardiologists. It has been provided by the trust at Trust Appendix 75, and it's written by the same expert who testified in the hearings of that 2640, Dr. Dent, and he says the importance of viewing multiple heartbeats and frames. And I'm going to quote now from the statement that's right there in the April 7, 2003 document. An echo reader cannot focus on a single frame without reference to the overall level of regurgitation as assessed using multiple frames and heartbeats. The interpreter, and I'm jumping now, the interpreter or auditor thus must properly appreciate the level of regurgitation where a single frame may not appropriately represent the true volume of the regurgitation during systole, and then he quotes, then it quotes from Dr. Wayman. Now let's look at Dr. Silvestri's opinion. First of all, it's not an opinion. He states clearly this is not a medical opinion. He says I... Yeah, but is that significant? I mean, he's reviewing it for a purpose, and isn't it sufficient? Well, Your Honor, it's highly qualified in this respect, and that's why I made the point about not a medical opinion. Repeatedly he says I am applying the settlement agreement's criteria. Isn't that what they're supposed to do? But, Your Honor, what he's saying is I am applying what some lawyer presumably has told me I'm supposed to have done. Okay. And the difference here is the very issue of representative, namely Mr. Petroff has previously stated, had previously stated at that time his view that the settlement agreement only required a single maximum jet to be determined and measured. Dr. Silvestri says, and this is right before the passage quoted by Mr. Petroff, I identified the maximum regurgitant jet and measured its area using particular software. He doesn't say here he went to some length, as Mr. Petroff says. He didn't say I've assessed the overall condition, and this woman has moderate mitral regurgitation. What he says is I found the maximum jet. Without regard, he doesn't say anything. They had the burden of saying so. He doesn't say this is representativeness. Now, why is that important? It was critical in 2640. It's critical in assessing moderate mitral regurgitation. Because what we're talking about here is a heartbeat, and every heartbeat is different. Some heartbeats occur at a time when the blood pressure is high, so you have a faster moving blood. There are other situations that can cause each jet to be different. You might have a situation in which a person's echocardiogram is taken, videotape made, and each jet might be quite different. You might find, then, that one jet is actually larger than the overall condition of the person. That's why in 2640 it was so important. After hearing six days of expert and other testimony about this subject, Dr. Bartle—sorry. Well, I misspoke, but it's really true. He's really become an expert on these issues. Judge Bartle concluded that you can't just look at a single frame. You have to look at the whole situation. What you're assessing is whether this person really is injured, really has moderate mitral regurgitation. Do we know that Dr. Churchwell looked at every frame? We don't. We don't know that. But don't we have to assume—I'm sorry, I didn't mean to— No, yeah, no, no, no. When I read Dr. Churchwell—I mean, both Churchwell and Silvestri seemed to be at the top of their field. And when they said that they reviewed everything, it seems to me that they have reviewed everything. They've reviewed multiple loops. Now, so I'm not sure that we can say that either one or the other didn't do a proper review. Now, there may be a failure of proof here on the part of the plaintiff because of what Silvestri didn't say. It may come down to that simple issue. But am I wrong in assuming that both of those doctors reviewed everything, the entire tape? I'm prepared to accept that Dr. Silvestri did review the entire tape. The question is, for what purpose? And in effect, this is Mr. Pentroff's bed that he made with his designation as to what should be measured. And now he's living with it. Exactly our position, Your Honor. That's why we think it's critical that Dr. Silvestri, who's, as you say, a well-regarded physician, qualified what he was saying. Every time he referred to moderate regurgitation, he says, by settlement criteria. That's what we think happened here, Your Honor. If you were on trial here, if you had the doctors, my guess is that if we got these two doctors in the same room and they looked at it, they'd probably come up with the same answer. But at this point, we don't know whether or not that's true. Part of the frustration in this case is the way that it's come up to us here with these unresolved issues. Well, Your Honor, that's why we think that there are two critical issues for this court. One is that Ms. Patterson had the burden. And two, that Judge Bartle has been doing this now for eight years, I believe it is, and he is an expert on the settlement agreement on the medicine and science, and we do not believe he abused his discretion here. My time is up, Your Honor. I'm happy to continue if you wish. All right. So your position is that – well, let me ask you this. If it were clear that Dr. Silvestri, at his opinion, to the extent it was an opinion, represented a representative measure and not just one single frame, would that be sufficient to rebut the auditing cardiologist here? Well, it's hard to know, Your Honor. Even Dr. Silvestri found a very borderline case here. And with nothing but what Dr. Silvestri submitted, if he had stated, I consider this one 20.57 measurement to be representative across the board, then it would have been a very close case. We don't have that here, Your Honor. We don't have the meeting of the burden. In that case, if Judge Bartle had ruled against Ms. Patterson, I think we would be heavily relying on the fact that it's an abuse of discretion standard. And I think that he has seen enough in this litigation to be entitled to some deference, and that's what the abuse of discretion standard entails. Is there too much deference being given to the auditing cardiologist in this process? Well, Your Honor, I would say that the history of this litigation shows the answer is no, because the litigation has been fraught with abuse on the part of the medical community. You say that and allege that in your brief, but none of that is in the record, is it? Well, 2640, Your Honor, is in the record, and that's what 2640 was about. Yeah, I mean, I've been involved in an appeal which involved some allegations of questionable legal and medical practices. Judge Bartle has had to deal with numerous proceedings involving this question of lawyers and physicians abusing the process, and there's been years of such abuse and litigation over such abuse, and even if you say, well, not if it's been proven. In this case, in this settlement? Yes, in this settlement, yes, Your Honor. All right. Just a very brief history. No, I accept that. Okay. But what happened here is that the number of claims that were in dispute were so enormous, we're talking about tens of thousands of claims, that Wyeth agreed to put up an additional $1.275 billion on top of what it had already committed to pay, which wasn't reduced, in order to move many of these moderate mitral claims, just like the one here, out of the trust into a whole separate funding facility where instead of trying to resolve all of these disputes about the validity of these claims, there was a separate claims administration procedure set up there under the jurisdiction of Judge Bartle but appointed by the plaintiff's bar, and they decided those cases in such a manner that those claimants would get a portion of the $1.275 billion. The amount of litigation was just overwhelming. All right. I think you answered my question. Thank you, Your Honor. Good. Mr. Rosenbaum, thank you. Thank you. Mr. Charles? Mr. Charles? Good morning. Good morning. Andrew Charles for the AHP Settlement Trust. I'd like to address some of the questions that have been posed, if that's all right. Sure. Rather than start from scratch. First is the question, the question was posed, when was the requirement of representativeness first articulated? And the first articulation of the multiple loop requirement, the requirement that more than one heartbeat be reviewed, was in November 2002 as part of pretrial order 2640, and that is the essence of the representativeness test. Wouldn't any reputable cardiologist or anyone at the top of their field do it in that manner? We would hope so, but as we read the reply brief, the question really is presented to this court, what does representativeness mean? And at least in the reply brief, there's a reference to the idea that one jet is enough, it's enough to measure, and it's enough to look at, as I understand the reply brief. But that's not what's stated in the revised audit rules in March 2003 or in the audit training course in April 2003, all before Dr. Silvestri's report. And what was clearly ignored by some people who submitted claims before November 2002 was the requirement that the entire tape be reviewed and that there be a review for representativeness so that we know that the single beat is not an artifact. So that test was born of or was articulated by the court because it was being ignored. And the court clearly had a concern in reviewing Dr. Silvestri's report. While Dr. Silvestri's report says, I reviewed the whole tape, it doesn't say for what. And to have this gap in what the report says it was reviewed for, was it reviewed for representativeness or not, is something that the court found telling. And the court has the responsibility to find facts based on what experts present and found that this experts report falls short in this review of various opinions. You are the lawyer for the trust. Correct. Is this a single incident or are there a lot of cases that are in this same procedural posture in terms of the reviews before the representativeness was laid out in a clear fashion? I don't present all the show causes. They don't reach outside counsel until they reach this court, or at least they don't reach this outside counsel until they reach this court. But I can tell you that we have presented in our brief at least three show cause opinions by the trial judge in which the trial judge had to look at representativeness as an issue and has been quite consistent in saying if there's one heartbeat which shows mitral regurgitation and that it's moderate, you still have to look at other heartbeats to determine if it's representative. We've cited a number in our brief. I know that the claimant's, the appellant's argument is that the judge sort of decides on how many experts there are and will only overrule an auditor when a technical advisor says that the judge should. But our brief shows that that's not the case. The judge is not giving special deference to the auditor. The judge is not looking at any test other than this representativeness test in this context, and where there's more than a heartbeat that shows mitral regurgitation at moderate or even close to moderate, the judge gives that ruling to the claimant. And there is one that's been ruled on shortly after the briefing was closed. It's called PCORA. It's pre-trial order number 7404, I believe, and I'll check it before I sit down, in which there was not even any heartbeat where it showed over 20. It was short of 20 by the technical advisor's opinion, but the technical advisor said it was pretty close, and there were other heartbeats that were also pretty close. So close gets you over 20 if it's representative, and so the court's been quite mindful of the representativeness requirement. If in this case Dr. Silvestri had made a representativeness representation, would that have been sufficient at least to place it in opposition to the auditing cardiologists? Well, I don't want to substitute my judgment for that of the trial judge. I understand that. Tell me, yeah, where would we be in this case? My understanding is that if there is an expert report that is well documented that shows a level of regurgitation at 20 or above in more than one heartbeat so that the finding of 20 is representative of other heartbeats, that the trial court has credited the report that says it's over 20. Even though the auditing cardiologists may have found it. The court has overruled auditing cardiologists many times, and we have shown that in the brief. The court does not give special weight to the auditing cardiologists. The test is based on the whole record should the claim be paid, and the auditing cardiologists' finding is but one of what may end up being an auditing cardiologist and a testing physician, some expert reports that bolster a testing physician, the technical advisor. And there's no showing, based on the review of these opinions that have been presented to the court by both sides, that the court is giving special weight to an auditing cardiologist. I think I've answered that question, but I've not. Is Dr. Silvestri someone who has been involved in other claims that have been before the court in this class action? Well, I'm aware of some statistics that Wyeth has given on Dr. Silvestri's findings and that they're not particularly high or reliable. I don't know. The trust hasn't done that study. I know there was something in the record, as in a number of cases, Dr. Harris was involved with. I don't remember seeing anything as to the number of times that Dr. Silvestri would have been involved. I don't recall giving a particular set of statistics on Dr. Silvestri. I know he is on a panel, and the panel is chosen as a result of, in connection with the Seventh Amendment, which the trust has nothing to do with. Right. The Seventh Amendment was created so that the trust would not have responsibility for certain findings. So I know that Dr. Silvestri may be part of a Seventh Amendment review panel and be the nominee of one of the parties, but he's not the trust's doctor. But his report is given weight by Judge Bartle. That's appropriate. And in this case, the weight was not high enough because it didn't disclose a complete review for the purpose at hand. Was the Seventh Amendment review panel created after Dr. Silvestri gave the report in this case? My understanding is that it is. Yes. So I think the point that I'd like to close with is that this is a bunch of expert reports here. There are three different reports, and the trial court has to look at all of them and decide what weight to give it. And in the face of sort of the hole in the expert report, what did Dr. Silvestri review beyond this single tape? It's not apparent that he measured anything. He may have eyeballed other things, but it's not apparent that he measured anything. And what is apparent is that while he says he reviewed the rest of the tape, for what? And that's what the trial court couldn't find. Well, he measured something because he got a figure. He did measure one heartbeat at 20.57, which somebody else saw as less. And perhaps if the court said, you know what, it is 20.57, there still has to be more under this test, and that's what's missing. Unless there are further questions, I'll rest. Good. Mr. Charles, thank you very much. Mr. Petro? I have no idea how much time I have left. You have four minutes. Thank you very much. I think it's very important Mr. Charles just said that the court was to look at everything in front of him. I think that the trust owes that to the claimants. I think that the claimants deserve that, that let's put what's in front of us and see what's there. And what we have is an auditing cardiologist who didn't take the time to tell us anything except there's less than 20%. That's what he said. Less than 20%. The critical issue here is are we 20 or more? You don't have to be over 20, 20 or more. So we've got one guy saying, you're less than 20, but I'm not going to tell you how much. And at appendix 0235 of Wyatt's appendix, he said mild. So what we have is mild is a range from 6 to 19.999. And all we've got this auditor saying is it's less than 20. And Judge Bartle, go figure out what to do with this. And as you have acknowledged, you can eyeball it. You don't have to measure it. Well, sure. But why does he say less than 20? Why didn't he say less than 6? They just told him. Well, because he didn't measure it. He eyeballed it. And you have acknowledged that that is not an inappropriate way to review it. I totally agree. But the problem is when you say less than 20 and you're asking the judge to make a medical legal decision, why not at least say way less or anything rather than less than 20 and just kind of leave it at that? Does that say 6%? No. No, but it says less than 20. It does. And the other doctor said exactly 20, and the other one said 20.57. So unless you're going to read less than 20 meaning 6 or something, you're faced with three doctors. So you're saying even though you acknowledge that you don't have to measure because this guy didn't measure, we shouldn't believe him. No, no. Or we shouldn't credit him. I'm saying look at the totality of the record that Judge Bartle had, and what does he have? He's got some doctor saying mild, which has a range from 6 to 19.99, and he's not giving us anything more than that. And I'm just saying take that. And he doesn't need to give us anything more than that. That's right. That's exactly right. He can give as little as he wants. He could have said trivial. He could have said an absent. He could have said it's a bogus study, and there's places for lots of comments where he could have said all that. Instead he said overestimated, not overtraced, not improper anything. Overestimated, and it's less than 20, and it's mild. And I submit that's not enough to deny a claimant's claim when you have somebody else saying 20, and you've got somebody else going through efforts to say measurements. They said he didn't measure. He measured. Measurements. It's in there. And I think that's important, and I know I'm running out of time, but it's very important. Judge Bartle gave us guidance in 2640. He said here's what you need. You need to have the regurgitation between 20 and 40 at its most expansive point. That's 2640 page 8. That's YF0011. What does most expansive point mean? If it doesn't mean let's find the most and at least work with that. You don't go up. You don't worry about BBs of little blood. So are you saying representative doesn't mean you have to have more than one heartbeat involved with 20 percent? You have to look at the whole study. You have to make sure you're not doing random wild jets. You have to make sure that it's in context. That's what 2640 said, that it's in context and that it's true. And Dr. Silvestri went out of his way to say it's an a-listing Doppler jet, which is the hallmark, according to Judge Bartle, of moderate regurgitation. I mean we have so much more. In one jet that he measured. He measured one jet, right? For you to have. He measured one jet, right? He printed out the measurements of the maximum jet. There's nothing to say he measured only one. How can you know it's the maximum if you don't get it? If he measured more than one, one would assume that he would include that in his report, right? Well, there's no, no. Judge Bartle said find the most expansive point, and he did that. I mean that's what you do as a doctor. You find the most expansive point. That's what you focus on in your care. That's what you focus on here. That's what Judge Bartle said to do. Most expansive point. How can anybody read that and at least not say it's worth, if you're going to do this, it's worth finding the maximum jet, and you know what? If you really want, let's print it out and show it to you. Okay, and you're saying it can be on the basis of that one jet and not representative of heartbeats? No. I'm saying that you have to have true regurgitation, and for it to be an alias and Doppler jet, it's not a random thing. It's something that you're going to see. That's why Judge Bartle said when you see that, that's the hallmark. You don't get that on some random thing unless somebody's sitting on your heart, literally. You just simply don't get there. You don't have phantom jets that are aliasing Doppler jets, and that's what Judge Bartle said in his opinion. That's the hallmark. Good. I think we understand the position. Okay. We thank counsel for a helpful argument in this matter. We will take the case under advisement. I think a tape, a transcript of the argument would be helpful to the court, so I'm going to ask that the lawyers arrange for that with the clerk's office and to share the cost, to split the cost of the transcript. We thank all counsel. Thank you. Take the matter under advisement. Thank you.